**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALBERT BIBBS,                                No. C 08-04377 JSW

       Petitioner,               **ORDER DENYING PETITION FOR A**
                                             **WRIT OF HABEAS CORPUS**
  v.

BEN CURRY, Warden, et al.,

       Respondents.
_____/

**INTRODUCTION**

      Now before the Court is the petition for a writ of habeas corpus filed by Petitioner Albert Bibbs ("Bibbs"), pursuant to 28 U.S.C. § 2254.  The petition is now ripe for consideration on the merits.  The Court has considered the parties' papers, the record, and relevant legal authority.  For the reasons set forth herein, the Court DENIES the petition.

**BACKGROUND**

**A.**    **Procedural History.**

      On July 16, 1991, Bibbs was convicted by a jury of willful, deliberate, and premeditated attempted murder and was sentenced to a prison term of seven years to life.  (Petition ("Pet.") at 13:2.)  Bibbs does not challenge the validity of his underlying conviction or the sentence imposed on him by the trial court.  Rather, Bibbs bases his claims on the Board of Prison Term's ("the Board") decision to deny him parole at the parole suitability hearing held on February 14, 2007 ("the

February 2007 Hearing"). (*Id.* at 13.)

Prior to the February 2007 Hearing, Bibbs had also appeared before the Board on September 15, 1999, February 27, 2002, February 25, 2003, and July 27, 2004.[1] After he was denied parole at the February 2007 Hearing, he filed a petition for a writ of habeas corpus before the Superior Court of California, County of Contra Costa ("the Superior Court"). On October 31, 2007, the Superior Court issued a reasoned opinion in which it denied Bibbs's petition. (Respondent's Ex. 2.) Bibbs appealed the Superior Court's denial of his habeas petition to the California Court of Appeal, First Appellate District ("the Court of Appeal"), which summarily denied Bibbs's appeal on March 13, 2008. (*Id.*, Ex. 4.) Bibbs then petitioned the Supreme Court of California to review the denial of his habeas petition; the Court summarily denied Bibbs's petition on May 21, 2008. (*Id.*, Ex. 6.)

Having exhausted his remedies in California's court system, Bibbs filed the instant petition with this Court on September 18, 2008. Respondents filed an answer on January 13, 2009. On February 9, 2009, Bibbs filed a traverse.

**B.     The Commitment Offense.**

Bibbs was convicted of attempting to murder Darryl Ledford. The facts as found by the Court of Appeal on direct review are as follows:

> The shooting of Darryl Ledford occurred in the early morning of August 27, 1990, in a residential subdivision in Brentwood. Bedford was shot twice with a 12 gauge Mossberg 500 shotgun: once in the chest and once in the arm. Although Ledford survived the attack, he offered little information concerning the attack or his attackers at the preliminary examination, and he did not testify at trial. Ledford was shot in retaliation for his suspected participation with Tim Wood in the theft of a large amount of methamphetamine (valued at approximately $400,000) belonging to David Terry, a large methamphetamine manufacturer and "dealer" in Contra Costa County. Terry also had a rock band, which defendant, a drummer, had hopes of joining. Terry routinely supplied defendant with methamphetamine and in exchange was "willing to do just about anything to help [Terry] out."

> That included helping Terry recover the missing methamphetamine. When defendant and Ledford arrived to stake out the Wood's residence on Bethel Island, Ledford went inside and began to shoot at defendant. "Wigged out" defendant left and went home. Later that night, Terry contacted defendant again. According to defendant, he was "tooting" methamphetamine at least 10 times during the 24 hours

---

[1] This Court denied Bibbs's previous petition for habeas relief challenging the denial of parole after the hearing on July 27, 2004.

preceding the shooting.

During the early morning hours of August 27, Terry, Bell and appellant searched for the thieves dressed in camouflaged clothing that defendant had purchased earlier. Terry, the driver, was armed with a nine millimeter assault rifle, Bell, in the passenger seat, had a M-1 military rifle, and in the back seat with defendant was Terry's Mossberg shotgun. At some point Terry spotted Ledford and followed him to the Brentwood subdivision. Ledford parked his car and approached Terry. An argument ensued with Terry accusing Ledford of "turning on him and . . . playing with the opposite side . . . ." What happened next is where the factual dispute lies.

The prosecution's evidence suggested that defendant then lifted the shotgun and fired at an unarmed Ledford at nearly point blank range, hitting him in the chest. Ledford was pushed back into his car, but he managed to run to a nearby house where he was refused admittance. Ledford then staggered toward an intersection where a commuter was sitting in a parked vehicle. The commuter watched as Ledford, holding his large intestine with both hands, was shot again (in the arm) by a pursing [sic] defendant. At Ledford's urging, the commuter placed him in the back of his truck and drove to the nearest hospital. Bell and Terry fled; defendant ran into a freshly tilled field where midway through it he buried the shotgun. Defendant attempted to escape by crawling across the field but was discovered by the police hiding in tall grass in a ditch near the edge of the field.[2]

In his initial statement to the police defendant denied shooting Ledford. He claimed to have hitched a ride from two unknown men who had offered to drive him to Antioch after completing some business. Defendant watched as Ledford pulled out a black .22 caliber Rueger automatic from his rear pocket, and the passenger in the front seat responded by shooting Ledford with a shotgun. Defendant then fled into the field when the passenger came after him with the shotgun.

In his second statement to the police, defendant admitted shooting Ledford but said it was in self-defense. After the argument with Terry, Ledford backed away from the Honda and removed a black Rueger automatic; defendant responded by shooting him with the shotgun.

While in jail, defendant wrote Ledford a letter in which he apologized for the shooting and indicated that Terry had forced him at gunpoint to shoot Ledford. There was no mention of Ledford having been armed.

The defense attempted to establish that defendant had shot Ledford initially in self-defense (Ledford pulled the gun first) and then as a result of duress by Terry, who had threatened to kill defendant if he did not kill Ledford.

Defendant testified that he did not plan to shoot Ledford. He stated that he saw Ledford back away from the car and pull a small black gun (identified by

_____

[2] Terry Bell was arrested a few days later: when stopped Bell had a loaded .380 automatic.

defendant as the one found later by neighborhood teen-agers in a nearby storm drain), from his pocket.  Afraid "for [his] life", defendant fired.  Terry then ordered defendant to "'get out and finish him or you're dead.'"  Knowing that Terry had an assault rifle, defendant did as he was told.  Defendant followed Ledford and discharged the shotgun but did not intend to hit Ledford.  When he heard Terry drive away, defendant stopped chasing Ledford and ran in the opposite direction.

The gun found by neighborhood teen-agers was an antique, rusted, nickle-plated .38 caliber fully loaded Smith and Wesson revolver.  According to the teen-agers, they had first observed the gun on February 10, 1991.  In March, one of the youths retrieved the gun from the bottom of the storm drain and took it home.  A few days later he informed his father about the gun and he summoned the police.  But the revolver had not been seen by a defense investigator, a police officer, or a city employee who had searched the storm drains in the end of February.

A number of police officers testified to Ledford's reputation for violence.  Ledford also had multiple prior convictions: two counts of assault with a firearm, and single counts of shooting at a vehicle, of being a felon in possession of a concealable firearm, of an unlawful taking of an automobile, and of the unlawful sale of a noncontrolled substance.

Debbie Orum testified that David Terry also had a reputation in the community for being "pretty wild, pretty violent . . . always with . . . a gun [waving] it around.  Bragging.  Always showing it off."  About two weeks after the shooting, she overheard Terry "bragging" to the effect that he would have shot defendant "then and there" had he not shot Ledford.

(Respondent's Ex. 1, Appx. A at 271-75.)

## C.    Bibbs's February 14, 2007 Hearing.

Bibbs appeared before the Board for his fifth suitability hearing on February 14, 2007.  The Board asked Bibbs about his adult criminal history, which included misdemeanor convictions for: (1) carrying a loaded weapon in a vehicle; (2) trespass; (3) battery of a peace officer; and (4) carrying a loaded firearm in a public place.  (*Id.* at 20:14-23:24.)  The Board also asked Bibbs about his history of drug use.  He stated that he first used methamphetamine when he was "about 14 or 15," and became "heavily involved" in methamphetamine (and also began using marijuana) when he was eighteen.  (*Id.* at 25:22-28:14.)  The Board asked Bibbs about his mental state at the time of the commitment offense, and Bibbs explained that "the [methamphetamine] had a mean hold" on him, and that his "wanting to fit in" also influenced his thought process at the time of the offense.  (*Id.* at 27:14-23, 31:19-25.)  Bibbs also agreed that he was "rather insecure" at the time of the offense.  (*Id.* at 35:1-4.)  Bibbs stated that his character has evolved since that time, and that he now considers the

4

needs of others rather than behaving selfishly.  (*See id.* at 35:5-36:14.)

Next, the Board examined Bibbs's behavior during his term of imprisonment.  The Board reviewed the vocational training that Bibbs had acquired while in prison, and found he had worked at the welding shop, where he received work evaluations that ranged from "satisfactory" to "exceptional."  (*Id.* at 43:7-24.)  The Board noted that Bibbs had also worked in the mill and cabinet shop.  The Board observed that, although Bibbs had received training in two trades while in prison, he had not achieved certification in a particular trade.  (*Id.* at 45:16-19.)  Members of the Board asked Bibbs about the substance abuse counseling he had undergone while in prison.  Bibbs confirmed that he participated in Narcotics Anonymous and Alcoholics Anonymous from 1998 until the time of the hearing, but admitted that he did not participate prior to 1998 because at the time "[t]here were other things to worry about than going to those meetings."  (*Id.* at 46:15-47:11.)

The Board then reviewed Bibbs's prison disciplinary record, which included eighteen minor infractions and six major violations.  (*Id.* at 55:2-17.)  While at least one of these violations were issued due to Bibbs's aggressive behavior towards prison staff, none of Bibbs's violations stemmed from overt acts of violence.  (*See id.* at 135-36.)  Bibbs was first disciplined in 1992.  (*Id.* at 141.)  The Board asked Bibbs about his most recent minor infraction, which occurred on November 27, 2005, and about his most recent major violation, which occurred on January 1, 2003.  The Board noted that Bibbs's most recent minor infraction was for violating "grooming standards," and that his most recent major violation was for "refusing a direct order."  (*Id.* at 55:7-17.)

The Board also reviewed the findings from a psychological evaluation performed by Dr. Marek that Bibbs had undergone on December 22, 2006.  Dr. Marek's evaluation noted that Bibbs had taken two psychological tests that both indicated "a low risk of violence," but ultimately found that, due to his prison disciplinary record, "his violence potential . . . [in] the community, if considered in the most hopeful, best possible light, can be viewed as below average to average."  (*Id.* at 56:2-57:21.)  Although it was not discussed during the Board's questioning of Bibbs, the Board cited in its decision an additional psychological evaluation that Bibbs underwent on August 31, 2006.  (*Id.* at 113:16-20.)  The examining psychologist for that evaluation, Dr. Reed, posited that Bibbs's disciplinary problems heightened the risk of Bibbs behaving violently within the community

**United States District Court**
For the Northern District of California

if released on parole.  (*See id.* at 113:20-114:9; 354.)  Specifically, Dr. Reed concluded that Bibbs could have a "slightly above average" potential for violence, and explained that this potential for violence was "largely in light of his disciplinaries with staff."  (*Id.* at 354.)

The Board reviewed letters that had been submitted in support of Bibbs's parole application. These letters demonstrated that Bibbs had post-parole housing options (in California, and also at Bibbs's mother's home in Missouri), as well as an offer of employment from a handyman.  (*See id.* at 59:17-78:20.)

The Board offered Bibbs an opportunity to make a final statement regarding his suitability for parole, and Bibbs used that opportunity to express his remorse for the crime, and to emphasize his profound personal changes in the time since committing the underlying offense.  The Deputy District Attorney who was present at the hearing made a closing statement urging the Board to deny Bibbs parole.  To support the request for denial, the District Attorney argued that: (1) the underlying offense was extraordinary callous; (2) Bibbs had a criminal record prior to committing the offense; (3) Bibbs had accumulated an extensive disciplinary record while in prison; (4) Bibbs's psychological evaluation was "not totally supportive of release"; and (5) Bibbs's post-parole employment plans were uncertain due to Bibbs's failure to "upgrade vocationally."  (*Id.* at 93:7-98:3.)  Bibbs's attorney, on the other hand, argued that: (1) all first degree attempted murders are callous, and Bibbs's crime was not especially so; (2) none of Bibbs's disciplinary violations were related to violence or substance abuse; (3) Bibbs's psychological evaluation was positive and demonstrated remarkable progress as compared with his previous psychological evaluations.  (*Id.* at 98:6-106:14.)

The Board denied Bibbs parole for a two-year period.  In its decision, the Board cited several reasons for its denial.  First, the Board relied on the "callous[] and calculated" manner in which Bibbs carried out the commitment offense, which demonstrated a "disregard for human suffering." (*Id.* at 10:14-110:9; 117:1-19.)  Second, the Board relied on Bibbs's "escalating pattern of criminal conduct" during the period preceding the commitment offense.  (*Id.* at 112:2-15.)  Third, the Board found that Bibbs's conduct during his imprisonment did not evince suitability for parole. Specifically, the Board found that Bibbs had "failed to upgrade vocationally," had not "sufficiently

1    participate[d] in self-help," and had accumulated an excessive amount of disciplinary infractions

2    while imprisoned, which included several recent incidents.  (*Id.* at 112:16-18.)  Lastly, the Board

3    found that neither of two recent psychological evaluations that Bibbs had undergone were "stellar

4    endorsement[s]" of granting him parole.  (*Id.* at 113:16-114:14.)

**ANALYSIS**

**A.    Standard of Review.**

7         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

8    custody pursuant to the judgment of a state court only on the ground that he is in custody in violation

9    of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Rose v.*

10   *Hodges*, 423 U.S. 19, 21 (1971).  Because the petition in this case was filed after the effective date

11   of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions

12   apply.  *See Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

13        Under AEDPA, this Court may grant the petition with respect to any claim that was

14   adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

15   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

16   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

17   a decision that was based on an unreasonable determination of the facts in light of the evidence

18   presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*,

19   529 U.S. 362, 413 (2000) (hereinafter "*Williams*").

20        Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only

21   if the state court "'applies a rule that contradicts the governing law set forth in [United States

22   Supreme Court] cases,' or if it 'confronts a set of facts that are materially indistinguishable from a

23   decision'" of the Supreme Court and nevertheless reaches a different result.  *Early v. Packer*, 537

24   U.S. 3, 7 (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application"

25   clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct

26   governing legal principle from the Supreme Court's decisions but unreasonably applies that

27   principle to the facts of the prisoner's case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may

28   not issue the writ simply because that court concludes in its independent judgment that the relevant

**United States District Court**
For the Northern District of California

7

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 412.  The objectively unreasonable standard is not a clear error standard.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir. 2003), *cert denied*, 540 U.S. 968 (2003).  After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision.  *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

The standard of review under AEDPA is somewhat different when the state court gives no reasoned explanation for its decision on a petitioner's federal claim and where there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively unreasonable.  *See Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).  Therefore, while a state court decision on the merits concerning a question of law normally should be afforded respect, "[i]f there is no such decision on the merits . . . there is nothing to which to defer."  *Greene*, 288 F.3d at 1089.

**B.     Bibbs's Habeas Petition is Denied.**

**1.     The Impact of *Hayward* on Bibbs's "Some Evidence" Claim.**

Bibbs claims that the Board's decision to deny him parole was not supported by "some evidence" of current dangerousness.  Respondent argues that AEDPA precludes application of the "some evidence" standard, because AEDPA allows habeas relief only for violations of clearly

established Supreme Court precedent.  On this point, Respondent argues that there is no clearly established Supreme Court precedent that requires "some evidence" of the inmate's danger to support a denial of parole.

Respondent's argument ignores the Supreme Court's holding that "state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." *Board of Pardons v. Allen*, 482 U.S. 369, 371 (1987).  The Supreme Court recently reiterated this rule in *Wilkinson v. Austin*, in which it held that "[a] liberty interest may arise from . . . an expectation or interest created by state laws or policies."  545 U.S. 209, 221 (2005).  These and similar holdings have created a "long established" principle "that state law gives rise to liberty interests that may be enforced as a matter of federal law."  *Pearson v. Muntz*, 606 F.3d 606, 611 (9th Cir. 2010) (per curiam).

The Ninth Circuit recently interpreted the Supreme Court's *Allen* and *Wilkinson* decisions in *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010).  The *Hayward* court held that there is no constitutional right to "release on parole, or to release in the absence of some evidence of dangerousness" that arises directly from the Due Process clause of the United States Constitution. *Id.* at 555, 561.  Nevertheless, the court held that such a right may "arise from substantive state law creating a right to release."  *Id.* at 555.  The *Hayward* court overruled *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003), *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), and *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007), to the extent those cases might be read to imply a contrary rule. *Id.*; *see also Pearson*, 606 F.3d at 610 n.3.  Having held that substantive California law controlled their inquiry, the Ninth Circuit then held that, under California law, inmates have "the right to parole in the absence of 'some evidence' of future dangerousness."  *Hayward*, 603 F.3d at 562.  Therefore, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002).

"California law requires the Board to grant an eligible inmate a parole date unless the Board determines that 'consideration of the public safety requires a more lengthy period of incarceration for this individual.'"  *Pirtle v. Cal. Board of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010) (quoting Cal. Penal Code § 3041(b)).  Thus, under California law, "the paramount consideration . . .

United States District Court
For the Northern District of California

is whether the inmate currently poses a threat to public safety." *In re Lawrence*, 44 Cal. 4th 1181, 1210 (2008) (citing *In re Dannenberg*, 34 Cal. 4th 1061, 1070-71, 1079-1080, 1083-84, 1091, 1094, 1098 (2005), and *In re Rosencrantz*, 29 Cal. 4th 616, 653-54, 682-83 (2002)). To find that the inmate currently threatens public safety, there must be "some evidence" that the inmate is currently dangerous. *Pirtle*, 611 F.3d at 1020; *Hayward*, 603 F.3d at 562 (citing *Lawrence*, 44 Cal. 4th at 1205-06).

The California Supreme Court has provided guidance as to what may constitute "some evidence" that an inmate poses a present danger to the public. Notably, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public." *Lawrence*, 44 Cal. 4th at 1214 (emphasis in original); *see also In re Shaputis*, 44 Cal. 4th 1241, 1254-55 (2008) ("This inquiry . . . cannot be undertaken simply by examining the circumstances of the crime in isolation . . . ."). "Thus, there must be more than the crime or its circumstances alone to justify the Board's or the Governor's finding of current dangerousness." *Cooke v. Solis*, 606 F.3d 1206, 1214 (9th Cir. 2010). There is, however, an exception to this general rule: the Board may find present danger based on the crime's aggravated circumstances if "something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." *Lawrence*, 44 Cal. 4th at 1214.

Accordingly, as explained in *Hayward*, this Court must review Bibbs's "some evidence" claims to determine whether the California judicial decision approving the Board's decision to deny parole "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); *see also Cooke*, 606 F.3d at 1213; *Pearson*, 606 F.3d at 608.

**2.      The Superior Court's Decision Applied the Correct Law.**

Both the Supreme Court of California and California Court of Appeal summarily denied Bibbs's habeas petition. (Respondent's Exs. 4, 6.) The Superior Court provided the last reasoned

10

**United States District Court**
For the Northern District of California

decision regarding Bibbs's habeas petition. (Respondent's Ex. 2.) Therefore, the Court "looks through" the appellate courts' decisions and reviews the reasoned decision provided by the Superior Court. *See Shackleford*, 234 F.3d at 1079 n.2 (citing *Ylst*, 501 U.S. at 803-04).

In its opinion, the Superior Court correctly recognized that, under California law, the Board's decision regarding an inmate's suitability should be left undisturbed if the decision was supported in the record by "some evidence" that the inmate would pose a danger to the community if released. The Superior Court also recognized that, at the time it issued its decision, California law was unclear as to whether the circumstances of the commitment offense could in themselves amount to "some evidence" that the inmate was presently dangerous to the community.[3] Ultimately, the Superior Court held that this opacity in the law was irrelevant to its decision because "the [Board's] finding was not based solely on the circumstances of the commitment offense or other immutable factors." (Respondent's Ex. 2 at 9.) Indeed, the Superior Court noted that the Board's denial of parole would meet the "some evidence" standard even if the circumstances of the commitment offense were altogether disregarded. (*Id.* at 10 (noting that Bibbs's disciplinary record alone "could lead the [Board] to conclude that the Petitioner had not yet spent enough disciplinary-free time in prison to enable the[Board] to find that he would not present an unreasonable risk of danger").) Because the Superior Court applied the "some evidence" standard and did not rely solely on the circumstances of Bibbs's commitment offense to uphold the Board's denial of parole, the Superior Court's decision was consistent with clearly established federal law.

> **2.      Although the Board Incorrectly Relied on Bibbs's Pre-Incarceration Criminal History, Its Decision Was Nevertheless Supported by "Some Evidence" That Bibbs Would Be a Danger to the Community if Released.**

The Board based its finding that Bibbs posed a present danger to the community on factors beside the circumstances of Bibbs's commitment offense. However, Bibbs argues that these bases for denying him parole "are either not permitted . . . or simply do not constitute evidence of unsuitability." (Petitioner's Mem. P & A at 33:25-27.)

---

[3]  The Superior Court noted that this precise issue was before the California Supreme Court at the time it issued its decision. As discussed above, the California Supreme Court resolved this issue by holding that, unless certain circumstances were present, the commitment offense may not serve as the Board's sole basis for finding an inmate is dangerous to the community. *See Lawrence*, 44 Cal. 4th at 1214.

**United States District Court**
For the Northern District of California

The Board's decision to deny Bibbs parole was influenced by Bibbs's "escalating pattern of criminal conduct" during the period preceding the commitment offense. (*Id.* at 112:2-15.) As the Ninth Circuit noted in *Hayward*, the Board's decision to base a denial of parole on "unchanging factors such as . . . preincarceration history" is at odds with the parole system, which assumes that rehabilitation is possible. *Hayward*, 603 F.3d at 570 (Berzon, J., concurring); *see also Carlin v. Wong*, 552 F. Supp. 2d 1023, 1033 (N.D. Cal. 2008) (holding that pre-incarceration crimes do not constitute some evidence of current dangerousness where they occurred many years before the denial of parole and were non-violent). Here, Bibbs's pre-conviction crimes occurred between 1986 and 1990. (Respondent's Ex. 1, Appx. A at 138.) Thus, at the time of the February 2007 Hearing, the most recent of these crimes was seventeen years old. (*See id.*) In light of the lengthy period between Bibbs's pre-incarceration criminal convictions and the February 2007 Hearing, the Court finds that the connection between Bibbs's pre-incarceration crimes and his current potential danger to the community is too attenuated to satisfy the "some evidence" standard.

The Board also cited Bibbs's prison disciplinary record as a reason for its decision to deny Bibbs parole. This observation must be supported by the record if it is to be a valid basis for denying Bibbs parole. *See Holder*, __ F. Supp. 2d __, 2010 WL 3076822, at *11 (disregarding the Board's findings of dangerousness where "the record shows these findings are not only unsupported by any evidence in the record, but are, in fact, contradicted by it"). Under the California Parole regulations, an inmate's institutional behavior is one of the factors the Board considers in determining whether the prisoner poses a current risk of danger to the public safety. *See* Cal. Code Regs. tit. 15, § 2404(c)(6). If the inmate had engaged in "serious misconduct" while imprisoned, this factor suggests that the inmate in unsuitable for parole. *Id.* Here, as Bibbs conceded during the February 2007 Hearing, he has several serious rules violations. (Respondent's Ex. 1, Appx. A at 101:19-20.)

In *Cooke v. Solis*, the Ninth Circuit addressed the significance of prison disciplinary violations under the "some evidence" inquiry. 606 F.3d at 1215. There, the court held that the "some evidence" standard was not satisfied by infractions that were: (1) minor; (2) remote in time from the parole hearing at issue; and (3) non-violent. *See id.* Here, the Board specifically noted that

United States District Court
For the Northern District of California

1  Bibbs had accumulated six major violations while imprisoned, and that the most recent of these

2  violations had occurred in January 2003—merely four years before the February 2007 Hearing.

3  (Respondent's Ex. 1, Appx. A at 113:11–15.)  Accordingly, the fact that Bibbs committed several

4  serious violations while imprisoned (one of which was recent) distinguishes the Board's reliance on

5  these violations from the Board's impermissible reliance in *Cooke* on minor and temporally distant

6  violations.  Bibbs does not deny that he committed these violations, but instead argues that the

7  Board erred by relying on these violations because none of them indicated a potential for violence.

8  Although Bibbs's infractions were non-violent, they nevertheless indicate that Bibbs lacks respect

9  for the law.  *Cf. Gomez v. Cal. Board of Parole Hearing*, No. 1:09-CV-00100 LJO JMD HC, 2010

10  WL 4322125, at *2 (E.D. Cal. Oct. 25, 2010) ("While the probative value of this disciplinary

11  infraction is lessened by the non-violent nature of the infraction . . . it [is] sufficient to meet the

12  'some evidence' standard.").  This disrespect and inability to follow directions demonstrates the

13  "modicum of evidence" that is necessary to satisfy the "some evidence" standard.[4]  *Lawrence*, 44

14  Cal. 4th at 1226 (citing *Rosenkrantz*, 29 Cal. 4th at 658).

15  Two of Bibbs's psychological reports also influenced the Board's finding that Bibbs posed a

16  danger to the community at the time of the February 2007 Hearing.  Psychological reports are

17  relevant to an inmate's suitability for parole, and therefore the Board is entitled to rely on such

18  reports.  *See Rosen v. Nielsen*, 428 F.3d 1229, 1232-33 (9th Cir. 2005), *overruled on other grounds*

19  *by Hayward*, 603 F.3d at 553.  The August 2006 report authored by Dr. Reed found that Bibbs's risk

20  for violence was "low to slightly above average compared to the average citizen."  (Respondent's

21  Ex. 1, Appx. A at 354.)  Shortly thereafter, on December 22, 2006, Dr. Marek performed a

22  psychiatric evaluation on Bibbs and found that "in the most-hopeful, best-possible light" Bibbs's

23  violence potential was "below average to average."  (*Id.* at 349.)  The Court finds that Dr. Reed's

24  conclusion that Bibbs might pose a greater danger to the community than an average citizen satisfies

25  the "some evidence" standard, and supports the Board's decision to deny Bibbs parole.  "'Resolution

26

27  _____

28  [4]  The link between Bibbs's disciplinary history and his potential for violence in the community is demonstrated by the findings of Dr. Reed, a psychologist who performed an evaluation on Bibbs. (Respondent's Ex. 1, Appx. A at 354 (concluding that Bibbs could have a "slightly above average" potential for violence in the community "in light of his disciplinaries with staff").)

United States District Court
For the Northern District of California

1   of any conflicts in the evidence and the weight to be given the evidence are within the authority of

2   the Board.'"   *Lawrence*, 44 Cal. 4th at 1204 (quoting *Rosenkrantz*, 29 Cal. 4th at 656).  Here, the

3   Board was presented with evidence (in the form of Dr. Reed's report) that Bibbs may have posed a

4   slightly above average danger to society.  The Board resolved this report as reflecting that Bibbs

5   presented a current danger to the community.  It was not unreasonable for the Board to interpret a

6   report that did not foreclose the possibility that Bibbs posed an above average danger to the

7   community as "some evidence" that Bibbs was presently dangerous.[5]

8          Accordingly, the Court finds that "some evidence" in the record supported the Board's

9   decision to deny Bibbs parole based on the Board's finding that he was currently dangerous to the

10  community.  The Board's reliance on Bibbs's pre-incarceration criminal convictions and the

11  circumstances of Bibbs's commitment offense was inappropriate.  However, the Board's findings

12  regarding Bibbs's psychological evaluations and prison disciplinary record were supported by the

13  record, and together these findings provided "some evidence" of Bibbs's present dangerousness to

14  the community.  *See Hayward*, 603 F.3d at 562.

## CONCLUSION

16         For the foregoing reasons, the Court hereby DENIES Bibbs's petition for a writ of habeas

17  corpus.  Rule 11(a) of the Rules Governing Section 2254 cases now requires a district court to rule

18  on whether a petitioner is entitled to a certificate of appealability in the same order in which the

19  petition is denied.  Petitioner has failed to make a substantial showing that his claims amounted to a

20  denial of his constitutional rights or demonstrate that a reasonable jurist would find the denial of his

21  claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Consequently, a

22  ///

23  ///

24  ///

25  ///

26

27         [5] Indeed, some courts have held that even a psychological evaluation concluding that the inmate
    represents merely an "average" risk of danger to society can amount to "some evidence" of current
    dangerousness.  *See, e.g.*, *Wagan v. Powers-Mendoza*, No. 1:07-cv-01461 AWI DLB HC, 2008 WL
28  4224406, at *5 (E.D. Cal. Sept. 12, 2008); *Burton v. Adams*, No. 1:08-CV-01567 AWI JMD HC, 2010
    WL 121105, at *8 (E.D. Cal. Jan. 7, 2010).

certificate of appealability is not warranted in this case.  A separate judgment shall issue, and the

Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: December 6, 2010

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

15